# 23-935-cv(L),
## 23-1004-cv(XAP)

### In the United States Court of Appeals for the Second Circuit

---

BROADCAST MUSIC, INC.,
PETITIONER-APPELLEE-CROSS-APPELLANT

*v.*

NORTH AMERICAN CONCERT PROMOTERS ASSOCIATION, as licensing representative of Live Nation entities including, AC Entertainment, Avalon, and Delsener; AEG; Elevated; and Another Planet Entertainment, Together with the Additional Promoters Listed on Exhibit A hereto,
RESPONDENT-APPELLANT-CROSS-APPELLEE

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, NO. 18-CV-8749, HON. LOUIS L. STANTON*

---

**BRIEF OF *AMICUS CURIAE* AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS IN SUPPORT OF PETITIONER-APPELLEE-CROSS-APPELLANT BROADCAST MUSIC, INC.**

---

JAY COHEN
HALLIE S. GOLDBLATT
PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
*1285 Avenue of the Americas*
*New York, NY 10019*
*jaycohen@paulweiss.com*

CLARA KIM
RICHARD H. REIMER
JACKSON WAGENER
AMERICAN SOCIETY OF COMPOSERS,
    AUTHORS AND PUBLISHERS
*250 West 57th Street*
*New York, NY 10107*

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the American Society of Composers, Authors and Publishers certifies that it is an unincorporated membership association.  It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

# TABLE OF CONTENTS

Interest of *Amicus Curiae* ...........................................................................1

Introduction and Summary of Argument .....................................................3

I.    The District Court's Consideration of the SESAC and GMR Benchmarks in Determining a Reasonable Fee for the BMI-NACPA License Was Proper and Consistent with Rate Court Case Law ........................................6

II.   Ignoring the SESAC and GMR Benchmarks Would Be Unfair to Regulated PROs' Members and Affiliates ....................................................13

Conclusion ...................................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Soc'y of Composers, Authors & Publishers* v. *Showtime/The Movie Channel, Inc.*, 912 F.2d 563 (2d Cir. 1990)...........................3, 6, 7, 10, 12

*In re Application of MobiTV, Inc.*, 712 F. Supp. 2d 206 (S.D.N.Y. 2010), *aff'd sub nom. Am. Soc'y of Composers, Authors & Publishers* v. *MobiTV, Inc.*, 681 F.3d 76 (2d Cir. 2012) ...................................11

*In re Application of THP Capstar Acquisition Corp.*, 756 F. Supp. 2d 516 (S.D.N.Y. 2010) .................................................9

*Broad. Music, Inc.* v. *DMX Inc.*, 683 F.3d 32 (2d Cir. 2012) ...............................................................10

*Broad. Music, Inc.* v. *DMX, Inc.*, 726 F. Supp. 2d 355 (S.D.N.Y. 2010) ...............................................10

*Broad. Music, Inc.* v. *Pandora Media, Inc.*, 140 F. Supp. 3d 267 (S.D.N.Y. 2015) .........................................7, 8, 9

*Pandora Media, Inc.* v. *Am. Soc'y of Composers, Authors & Publishers*, 785 F.3d 73 (2d Cir. 2015) ...............................................................7

*In re Petition of Pandora Media, Inc.*, 6 F. Supp. 3d 317 (S.D.N.Y. 2014), *aff'd sub nom. Pandora Media, Inc.* v. *Am. Soc'y of Composers, Authors & Publishers*, 785 F.3d 73 (2d Cir. 2015) ...................................................................8, 11

*United States* v. *Am. Soc'y of Composers, Authors & Publishers (In re Capital Cities/ABC, Inc.)*, 831 F. Supp. 137 (S.D.N.Y. 1993) ...................................................11

*United States* v. *Am. Soc'y of Composers, Authors & Publishers (In re Applications of RealNetworks, Inc., Yahoo! Inc.)*, 627 F.3d 64 (2d Cir. 2010) .............................................................6

*United States* v. *Am. Soc'y of Composers, Authors & Publishers (In re Application of YouTube, LLC)*,
   616 F. Supp. 2d 447 (S.D.N.Y. 2009) ...............................................................10

*United States* v. *Broad. Music, Inc. (Music Choice II)*,
   316 F.3d 189 (2d Cir. 2003) .............................................................................12

## Other Authorities

Assistant Attorney General Makan Delrahim, "And the Beat Goes
   On": The Future of the ASCAP/BMI Consent Decrees, Remarks
   as Prepared for Delivery, Virtual Event Hosted by Vanderbilt Law
   School (Jan. 15, 2021), *available at*
   https://www.justice.gov/opa/speech/remarks-assistant-attorney-
   general-makan-delrahim-future-ascap-and-bmi-consent-decrees ......................14

*United States* v. *Am. Soc'y of Composers, Authors & Publishers*,
   No. 41-1395, 2001 WL 1589999 (S.D.N.Y. June 11, 2001)......................*passim*

*United States* v. *Broad. Music, Inc.*,
   1966 Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y. 1966), *as amended by*
   1996-1 Trade Cas. ¶ 71,378 (S.D.N.Y. 1994) ..................................................1, 8

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae* the American Society of Composers, Authors and Publishers ("ASCAP") files this *amicus* brief in support of Appellee Broadcast Music, Inc. ("BMI").[1] As the only other Performing Rights Organization ("PRO") subject to a consent decree,[2] ASCAP is uniquely situated to highlight for the Court the history of Rate Court jurisprudence that provided the precedential framework for the decision below. That case law, which the District Court properly applied but Appellant North American Concert Promoters Association ("NACPA") urges this Court to ignore, unequivocally provides that both the ASCAP and BMI consent decrees provide for ASCAP members and BMI affiliates to be paid competitive market rates reflecting the fair market value of their musical works. In addition, ASCAP's 950,000 songwriter, composer, lyricist, and publisher members, who have collectively created more than 19 million musical works, have a substantial stake in

---

[1] The parties consented to the filing of this brief. No party or party's counsel authored any portion of this brief, and no person or entity other than *amicus* and its counsel contributed any money intended to fund the preparation or submission of this brief.

[2] Since 1941, ASCAP has operated pursuant to a consent decree, which has been modified two times. The operative version of the ASCAP decree, entered in 2001, is the Second Amended Final Judgment, commonly referred to as AFJ2. *See United States* v. *Am. Soc'y of Composers, Authors & Publishers*, No. 41-1395, 2001 WL 1589999 (S.D.N.Y. June 11, 2001). AFJ2 empowers the United States District Court for the Southern District of New York, sitting as the Rate Court, to set reasonable final license fees when ASCAP and a music user cannot agree on the terms of a license. *See* AFJ2 § IX(A). The BMI decree contains substantially similar terms, including as to rate setting. *See United States* v. *Broad. Music, Inc.*, 1966 Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y. 1966), *as amended by* 1996-1 Trade Cas. ¶ 71,378 (S.D.N.Y. 1994), Art. XIV.

1

the outcome of this appeal because this Court and trial courts in this Circuit have generally construed the provisions of the BMI consent decree and the ASCAP consent decree, AFJ2, in a consistent manner. As a result, affirmance of the District Court's decision—premised on the principle that free market license agreements with licensors not subject to a consent decree constitute the best evidence of the price that a willing licensee and a willing licensor would agree to in an arm's-length transaction in a competitive market—is vital to the livelihood of ASCAP's members, who depend on license fees collected by ASCAP to support their creative work. Tens of millions of dollars are at stake for ASCAP's members who, as a result of the decision below, are for the first time in a position to obtain fair market rates from concert promoters for the public performance of musical works in the ASCAP repertory that are the linchpin of the live concert industry.

ASCAP is the only U.S. PRO that is founded and governed by its members and that operates on a not-for-profit basis. ASCAP is an unincorporated membership association of more than 950,000 songwriters, composers, lyricists, and music publishers, who are the creators and owners of copyrights in more than 19 million works. ASCAP collectively licenses to music users the right to publicly perform its members' millions of works, something individual songwriter and composer members would not be able to do on their own. Members depend on ASCAP to negotiate licenses with hundreds of thousands of music users, track public performances, collect and distribute royalties, and advocate on their behalf.

ASCAP's licensees include the concert promoters at issue in this appeal, as well as television networks, radio stations, digital music services, and thousands of businesses that play music, such as bars, restaurants, and retail stores.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For decades, this Court has recognized that the determination of reasonable fees to be paid to ASCAP and BMI should be set at "fair market value" that "approximates the rates that would be set in a competitive market." *Am. Soc'y of Composers, Authors & Publishers* v. *Showtime/The Movie Channel, Inc.,* 912 F.2d 563, 569, 576 (2d Cir. 1990) ("*Showtime II*"). Because ASCAP and BMI historically represented nearly all of the musical compositions in the U.S., and are both regulated by antitrust consent decrees that require them to grant a license to any music user upon request, Rate Courts have lacked observable competitive market transactions that could be used as reliable benchmarks in setting license-fee rates. Due to the lack of market benchmarks, ASCAP and BMI rates—and the royalties earned by their members and affiliates for their creative work—have often failed to keep pace with music users' substantial revenue growth and increases in rates for licenses of other music rights.

In recent years, however, the market for public performance rights has meaningfully changed. Large music publishers have chosen to license directly with music users, outside of the PROs. One unregulated PRO, SESAC LLC ("SESAC"), has expanded the size of its repertory and aggressively competes with ASCAP and

BMI for songwriters and catalogs.  A second unregulated PRO, Global Music Rights LLC ("GMR"), was founded in 2013 and has established itself as an important market competitor, with a roster of well-known affiliates and a repertory of frequently played songs.  Unlike ASCAP and BMI, SESAC and GMR have no antitrust consent decree mandating that those PROs grant a license to music users upon request.  Accordingly, licenses entered into by these unregulated PROs provide the best evidence of the price that a willing licensee and a willing licensor would agree to in an arm's-length transaction in a competitive free market.  As the District Court recognized, the availability of these market transactions means that Rate Courts no longer must be confined to considering only prior ASCAP and BMI licenses, entered into in the shadow of their respective Rate Courts,[3] as imperfect proxies for fair market value.

NACPA and its licensee supporters nonetheless ask this Court to *ignore* the critical benchmark license agreements that concert promoters entered into with SESAC and GMR, calling the consideration of these licenses in setting the BMI-NACPA rate "legal error."  (NACPA Br. at 36.)  In this mistaken view, the only relevant benchmarks a Rate Court may consider in determining reasonable fees for

---

[3]   Under the ASCAP consent decree, ASCAP has no alternative but to initiate lengthy and costly Rate Court litigation if it cannot agree on reasonable license fee rates.  Unlike SESAC and GMR, ASCAP cannot withhold its members' music from users such as concert promoters; to the contrary, AFJ2 provides such users with an automatic license and immunity from copyright infringement upon application, even if users are not willing to pay fair market rates.  *See* AFJ2 §§ VI, IX.

an ASCAP or BMI license are *other* ASCAP and BMI licenses. But NACPA's argument turns well-settled ASCAP and BMI Rate Court case law on its head. It is contrary to the requirement that ASCAP members and BMI affiliates should be paid competitive market rates reflecting the fair market value of their works. And it would lead to a fundamentally unfair result: Music creators who license their works through regulated PROs would be paid proportionally less for their creative work than their peers because Rate Courts would be forced to ignore critical benchmark agreements that, unlike the ASCAP and BMI agreements, are truly the product of a free market negotiation.

In reality, the District Court's judgment increasing the license fees payable by NACPA's members *fulfilled* the mandate of the BMI and ASCAP consent decrees and decades of case law requiring the Rate Court to determine a fair market value for the license at issue. To conclude otherwise—and require, as NACPA and its supporters urge, rate-setting courts to turn a blind eye to free market transactions—would result in manifest unfairness to the more than two million songwriters, composers, and music publishers who rely on the regulated PROs to license their works and who are no less deserving of fair, market-determined compensation for their creative work than creators represented by SESAC and GMR. Nothing in the BMI consent decree (or AFJ2) requires such a result.

I.    **The District Court's Consideration of the SESAC and GMR Benchmarks in Determining a Reasonable Fee for the BMI-NACPA License Was Proper and Consistent with Rate Court Case Law**

The District Court properly considered the SESAC and GMR benchmark agreements with NACPA and other concert promoters in determining a reasonable fee for NACPA's license with BMI. The lower court's decision is consistent with long-standing case law governing rate-setting under the BMI and ASCAP consent decrees, under which the Rate Court is to determine a reasonable fee by reference to "what an applicant would pay in a competitive market." *United States* v. *Am. Soc'y of Composers, Authors & Publishers (In re Applications of RealNetworks, Inc., Yahoo! Inc.)*, 627 F.3d 64, 76 (2d Cir. 2010); *Showtime II,* 912 F.2d at 569–70, 576. The objective was never to suppress rates by keeping them at historically low, below-market rates. There can be no serious dispute that the SESAC and GMR licenses—negotiated without any compulsion on those PROs to issue a license or on the part of concert promoters to perform SESAC or GMR music—are the best evidence of what would be paid in a competitive, fair market transaction.

As the BMI Rate Court acknowledged (SPA10), "[f]undamental to the concept of 'reasonableness' is a determination of what an applicant would pay in a competitive market." *RealNetworks*, 627 F.3d at 76. Because the consent decrees governing ASCAP and BMI require each to grant a license to any music user upon request and they cannot decline to license when the music user refuses to pay a

6

competitive rate, courts have historically observed that "there is no competitive market in music rights." *Showtime II*, 912 F.2d at 577; *see also Pandora Media, Inc.* v. *Am. Soc'y of Composers, Authors & Publishers*, 785 F.3d 73, 76 (2d Cir. 2015) (noting that ASCAP has no right to withhold its repertory if it cannot reach agreement on price). Rate Courts thus have typically "lack[ed] any economic data that may be readily translated into a measure of competitive pricing for the rights in question." *Showtime II*, 912 F.2d at 577; SPA11. Courts have therefore been required to determine reasonable fees "by reference to 'benchmarks': the rates set in (or adjusted from) contemporaneous similar transactions," including benchmarks derived from prior ASCAP and BMI licenses that were not negotiated in a competitive or fair market. *Broad. Music, Inc.* v. *Pandora Media, Inc.*, 140 F. Supp. 3d 267, 270 (S.D.N.Y. 2015).

Here, by contrast, although the BMI Rate Court did consider prior ASCAP and BMI licenses as benchmarks, it did not need to adopt those imperfect proxies for fair market value because both SESAC and GMR had entered into arm's-length agreements with NACPA members. Thus, the BMI Rate Court correctly determined that the SESAC and GMR agreements were "appropriate benchmarks . . . between similar parties, for similar rights, and were negotiated in similar economic circumstances." SPA29. These agreements—entered into between willing buyers and willing sellers—constituted the best evidence of the fees that would be paid to

BMI if BMI were able to negotiate in a free market, unshackled from the constraints and influence of its consent decree.

This last point is critical to understanding why the District Court's decision should be affirmed. Neither BMI nor ASCAP is permitted under its consent decree to withhold the right to perform music in its repertory to any music user that applies for a license. *See* AFJ2 §§ VI, IX; BMI Decree Art. XIV. The only recourse that each of these regulated PROs has with respect to a music user who refuses to pay fair market compensation for a license is to initiate a Rate Court litigation that typically takes years to resolve and costs millions of dollars to prosecute.[4] ASCAP and BMI therefore both sparingly invoke their right to seek Rate Court determination of reasonable fees; in the past decade, there have been only three decisions by ASCAP and BMI Rate Courts setting final license fees. *See* SPA36–37 (setting BMI rates for concert promoters); *Pandora Media, Inc.*, 140 F. Supp. 3d at 294 (setting BMI rates for Pandora); *In re Petition of Pandora Media, Inc.*, 6 F. Supp. 3d 317, 372 (S.D.N.Y. 2014), *aff'd sub nom. Pandora Media, Inc.* v. *Am. Soc'y of Composers, Authors & Publishers*, 785 F.3d 73 (2d Cir. 2015) (setting ASCAP rates

---

[4]    As a case in point, this litigation was commenced by BMI on September 24, 2018, with a trial held between October 24, 2022 and November 21, 2022, and a decision issued four months later, on March 28, 2023. (A4, A17–A19.) If this Court affirms the Rate Court decision, it will have taken BMI approximately six years to establish reasonable license fees for concert promoters.

for Pandora). As a result, ASCAP and BMI are often typically required to settle for below market rates.[5]

NACPA's arguments to evade a fair market rate are based on two arguments, both of which fundamentally misconstrue governing Rate Court jurisprudence.

*First*, NACPA claims that the licenses are not comparable because SESAC and GMR are smaller than BMI and are not subject to their own compulsory rate-setting mechanism. (NACPA Br. at 37–39.) But the relative size of the unregulated PROs does not render the SESAC and GMR licenses insufficient benchmarks or diminish their usefulness as benchmarks. To the contrary, as the District Court correctly noted, "their market sizes are more comparable to those of the large music publishers that music users would have to negotiate with directly in the absence of PROs." SPA31. And, in several prior decisions, the Rate Courts have found that direct licenses between music users and music publishers, which also do not have their own compulsory rate-setting scheme, are highly relevant benchmarks. *See, e.g.*, *Pandora*, 140 F. Supp. 3d at 291 (concluding that Pandora's direct licenses with music publishers were relevant benchmarks); *In re Application of THP Capstar Acquisition Corp.*, 756 F. Supp. 2d 516, 537–38 (S.D.N.Y. 2010)

---

[5]  As BMI correctly points out in its brief (BMI Br. at 22–23), ASCAP has chosen not to renew the expired NACPA license, but is instead seeking to be paid fair market rates commensurate with the rates paid by concert promoters to GMR and SESAC and the District Court's finding of a reasonable fee for BMI.

(considering "the existence of direct licensing relationships" in AFJ2 proceeding); *Broad. Music, Inc.* v. *DMX, Inc.*, 726 F. Supp. 2d 355, 359–61 (S.D.N.Y. 2010) (holding that direct licenses between music user and several individual publishers could serve as appropriate benchmarks); *see also Broad. Music, Inc.* v. *DMX Inc.*, 683 F.3d 32, 47 (2d Cir. 2012) (noting that where user did not have direct licensing program, its rates agreed to with PROs "were less competitively set" than they would have been if applicant used direct licensing or if "music rights were more 'scattered among numerous performing rights societies'") (quoting *Showtime II*, 912 F.2d at 570). Similarly, in considering interim ASCAP license fees for the YouTube digital service, the ASCAP Rate Court previously concluded that SESAC license agreements were relevant benchmarks because they provided rates that represent "what a willing buyer (like YouTube) and a willing seller (like SESAC) would agree to in arms-length negotiations in a free (non-compulsory) market." *United States* v. *Am. Soc'y of Composers, Authors & Publishers (In re Application of YouTube, LLC)*, 616 F. Supp. 2d 447, 453–54 (S.D.N.Y. 2009).

NACPA asserts that Rate Courts have previously declined to rely on SESAC license fees as a benchmark for setting ASCAP fees. (NACPA Br. at 37–38.) But neither of the thinly reasoned decisions upon which NACPA erroneously relies[6]—issued at a time when the two unregulated PROs commanded a much

---

[6] Neither of the two Rate Court decisions engaged in any meaningful analysis of the applicability of the SESAC benchmarks (or considered GMR rates at all), and the Second Circuit did not address the SESAC benchmarks on appeal. *See In re*

smaller and more uncertain share of the music licensing marketplace than they do today—disputes the fundamental fact that makes both the SESAC and GMR licenses appropriate benchmarks for a BMI license:  Unlike ASCAP and BMI, SESAC and GMR are not compelled to issue a license in the absence of agreement on fees.  As a result, the SESAC and GMR licenses are agreements between willing buyers and willing sellers, with neither compelled to agree—the textbook definition of a competitive, fair market transaction.

*Second*, NACPA claims that the SESAC and GMR license agreements did not arise in a sufficiently competitive market and therefore the Rate Court cannot rely on them as benchmarks.  (NACPA Br. at 39 (noting that "SESAC and GMR are not subject to consent decrees that are designed to approximate market competition").)  But that argument finds no support whatsoever in Rate Court jurisprudence and was appropriately rejected by the District Court.  The decrees "do[] not require the Court to create the 'platonic ideal' of a competitive market," *United States* v. *Am. Soc'y of Composers, Authors & Publishers (In re Capital Cities/ABC, Inc.)*, 831 F. Supp. 137, 144 (S.D.N.Y. 1993), or to consider only those

---

*Pandora Media, Inc.*, 6 F. Supp. 3d at 362, *aff'd sub nom. Pandora Media, Inc.* v. *Am. Soc'y of Composers, Authors & Publishers*, 785 F.3d 73 (2d Cir. 2015); *In re Application of MobiTV, Inc.*, 712 F. Supp. 2d 206, 254 (S.D.N.Y. 2010), *aff'd sub nom. Am. Soc'y of Composers, Authors & Publishers* v. *MobiTV, Inc.*, 681 F.3d 76 (2d Cir. 2012).  In addition, recent investments by ASCAP and BMI in transparency and song ownership data since the date of those decisions allow for the calculation of PRO market share (including SESAC and GMR) with more certainty, thereby buttressing the reliability of the unregulated PRO benchmarks.

licenses that are the products of "perfect competition," *Showtime II*, 912 F.2d at 577. In fact, as noted above, Rate Courts have previously concluded that licenses between music users and unregulated licensors that are not subject to consent decrees "designed to approximate market competition" (NACPA Br. at 39) are sufficiently comparable and informative benchmarks. *See supra* pp. 9–10.

In sum, ASCAP urges this Court to decline NACPA's invitation to upend decades of rate-setting precedents and disregard relevant market transactions—*entered into by NACPA and its members*—so that NACPA and its licensee supporters can keep their BMI and ASCAP license fees artificially depressed. The SESAC and GMR licenses are observable market transactions that were negotiated between willing parties outside the shadow of the ASCAP and BMI consent decrees and their respective Rate Courts. They are the best available evidence of the actual value of public performance rights because they reflect competitive, fair market prices, agreed to by the very parties bringing this appeal, that are not distorted by the inability of ASCAP and BMI to withhold rights from an applicant. In this sense, they embody the goal articulated by the Second Circuit in determining a reasonable fee—that the Rate Court should determine the "fair market value" of a proposed license, which is "the price that a willing buyer and a willing seller would agree to in an arm's length transaction." *United States* v. *Broad. Music, Inc. (Music Choice II)*, 316 F.3d 189, 194 (2d Cir. 2003) (internal quotation marks and citations omitted); *Showtime II*, 912 F.2d at 569.

## II.    Ignoring the SESAC and GMR Benchmarks Would Be Unfair to Regulated PROs' Members and Affiliates

There is another fundamental problem with the position advanced by NACPA and its supporting *amici*:  It would lead to absurd and unfair results for the vast majority of music creators who choose to license their musical works through BMI and ASCAP.

NACPA's argument achieves no purpose other than to permit NACPA and other music users to pay market rates to SESAC and GMR while insulating themselves from the consequences of those rates when negotiating or litigating with ASCAP and BMI.  Accepting NACPA's position would materially disadvantage the millions of songwriters, composers, and music publishers who choose to license their works through the regulated PROs.  Their royalties would stagnate while SESAC and GMR affiliates would enjoy increased compensation.  There is certainly no support for such a result in either the BMI consent decree or AFJ2, which both contemplate fair market compensation to music creators for the public performance of BMI and ASCAP music.

NACPA offers no principled reason—and there is none—why music creators licensing through ASCAP and BMI should receive substantially less, on a pro rata basis, for performances of their works than their counterparts represented by SESAC and GMR.  To the contrary, as the former head of the Antitrust Division concluded in a recent review of the ASCAP and BMI consent decrees, a "guiding principle of the Division's future review efforts should be ensuring that songwriters

and other intellectual property rightsholders are not shortchanged by the non-market effects of the ASCAP and BMI consent decrees, or by other efforts to regulate the music marketplace."[7] Assistant Attorney General Makan Delrahim, "And the Beat Goes On": The Future of the ASCAP/BMI Consent Decrees, Remarks as Prepared for Delivery, Virtual Event Hosted by Vanderbilt Law School (Jan. 15, 2021), at 5, *available at* https://www.justice.gov/opa/speech/remarks-assistant-attorney-general-makan-delrahim-future-ascap-and-bmi-consent-decrees. That is precisely why the judgment of the District Court should be affirmed. Any other result would deprive ASCAP members and BMI affiliates of the fair market compensation for the public performance of their music that the ASCAP and BMI consent decrees are designed to protect.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's decision.

---

[7] These non-market effects may include, among other things, the impact of ASCAP and BMI license agreements being negotiated in the shadow of their respective Rate Courts, resulting in license fees below what would be obtained in true free market transactions. *See supra* pp. 4, 6–9, 12.

JANUARY 10, 2024

Respectfully submitted,

/s/ *Jay Cohen*

JAY COHEN
HALLIE S. GOLDBLATT
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*
  *(212) 373-3000*
  *jaycohen@paulweiss.com*

CLARA KIM
RICHARD H. REIMER
JACKSON WAGENER
AMERICAN SOCIETY OF COMPOSERS,
  AUTHORS AND PUBLISHERS
  *250 West 57th Street*
  *New York, NY 10107*

*Counsel for Amicus Curiae American Society of Composers, Authors and Publishers*

15

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Jay Cohen, counsel for *amicus curiae* American Society of Composers, Authors and Publishers and a member of the Bar of this Court, certify, pursuant to Federal Rules of Appellate Procedure 29 and 32 and Local Rule 32.1(a)(4)–(6), that the foregoing brief is proportionately spaced, has a typeface of 14 points or more, and contains 3,659 words.

JANUARY 10, 2024

/s/ *Jay Cohen*

JAY COHEN